GEORGE A. BENNETT, Plaintiff and Respondent, *v.* NORTHERN PACIFIC RAILROAD COMPANY, Defendant and Appellant.

### Injury to Employe—Contributory Negligence—Evidence.

1. Plaintiff was injured while coupling an engine to a car because there was not sufficient space for his body between them. The draw-bars of the engine and of the car were unusually short, leaving a space of only about 10 inches between the end of the car and of the engine when the draw-bars came together, whereas the usual space is from 24 to 30 inches. *Held* sufficient to justify a verdict that defendant's negligence was one of the proximate causes of the injury. It appearing that plaintiff was injured in consequence of his failure to obey the rule of defendant that he must examine so as to know the kind and condition of the coupling apparatus, the rule giving him sufficient time to make such examination in all cases, *held,* that he could not recover.

2. Exclamations and expressions of present pain may be proved by any one who hears them, although made subsequently to the injury.

(Opinion Filed July 27, 1891.)

*A*PPEAL from district court, Stutsman county; Hon. RODERICK ROSE, Judge.

*W. F. Ball* and *John S. Watson,* for appellant. *S. L. Glaspell,* for respondent.

Action to recover damages for a personal injury sustained by plaintiff while in defendant's employ. Judgment for plaintiff. Defendant appeals. Reversed and new trial ordered.

W. F. Ball and John S. Watson, for appellant:

The principle is well settled that no negligence can be inferred from the fact that a railroad track is constructed on a curve at the place of an accident to a servant. And this is true, although it appears that the accident would not have occurred had the track been straight. Tuttle v. Railroad Co., 122 U. S. 189. The wife of the plaintiff was asked the following question: "Have you ever noticed any exclamations or expressions of pain at any time," referring to the physical condition of the plaintiff. Evidence of this character is admissible only when it relates to expressions and exclamations made at or about the time of the injury. Reed v. Railroad Co., 45 N. Y. 574; Railroad. Co. v. Kuntley, 38 Mich. 537; Wharton on Evidence, § 268 and. cases cited; Laughlin v. Railroad Co., 44 N. W. Rep. 1049. An employe cannot judge of the reasonableness of the company's: rules. Walsey v. Railroad Co., 33 Ohio St. 227; Hulet v. Railroad. Co., 67 Mo. 239. It was undoubtedly contributory negligence on the part of the plaintiff to place himself in such a position as to incur the danger and suffer the injury complained of. Tuttle v. Railroad Co., 122 U. S. 189; Railroad Co. v. Lunde,, 11 Am. & Eng. R. R. Cases, 188. The plaintiff entered upon the service of defendant under a written contract and he cannot escape strict compliance with the terms to which he there consented. Railroad Co. v. Whitcomb, 31 Am. & Eng. R. R. Cases, 149; Darractus v. Railroad Co., 2 S. E. Rep. 511; Walsey v. Railroad Co., 33 Ohio St. 227; Railroad Co. v. Black, 88 Ill. 112. It was not negligence to receive the Union Tank Line car because it had a shorter dead wood and draft iron than those in use upon defendant's cars. Whitcomb v. Railroad Co., 12 Am. & Eng. R. R. Cases 214; Kelley v. Railroad Co., 21 Id 633; Railroad Co. v. Black, 88 Ill. 112; Smith v. Potter, 46 Mich. 258, 2 Am. & Eng. R. R. Cases 140. When an instruction is based upon a state of facts not warranted by the evidence, the manifest tendency of which is, from the special features of the case, to lead the jury to infer the existence of such facts and thereby take an erroneous view of the case, it is ground for reversal. Willis v. Railroad Co., 17 Am. & Eng. R.

R. Cases 542; Bank v. Eldred, 9 Wall. 554; St. Louis v. Risley, 10 Wall. 91; U. S. v. Breitling, 20 How. 254; Jones v. Randolph, 14 Otto 108; Boardman v. Reed, 6 Pet. 328; Insurance Co. v. Baring, 20 Wall. 158; Miller v. Railroad Co., 41 N. W. Rep. 28. An instruction to the jury which does not arise out of facts of the case, is inapplicable to it and is erroneoes. if calculated to mislead and confuse them. Railroad Co. v. Robbins, 2 Black 417; Bank v. Eland, 9 Wall. 554; Thompson, Charge to Juries, §§ 62, 63.

S. L. Glaspell for respondent:

Whether the plaintiff should have known and appreciated the danger was a question of fact properly submitted to the jury. Hugerford v. Railroad Co., 41 Am. & Eng. R. R. Cases 269; Lawless v. Railroad Co., 18 Id 96; Greenleaf v. Railroad Co., 29 Iowa 14; Goodrich v. Railroad Co., 22 N. E. Rep. 397; Kane v. Railroad Co., 32 U. S. 339 (Co-Op. Ed.); Thompson on Negligence, p. 1015-1239; Williams v. Railroad Co., 3 Dak. 168; Dorsey v. Phillips, 42 Wis. 583; Mares v. Railroad Co., 3 Dak. 336, on appeal 31 U. S. 296, (Co-Op. Ed.); Herbert v. Railroad Co., 3 Dak. 38, on appeal 29 U. S. 755 (Co-Op. Ed.) Defendant objects to plaintiff's wife testifying that plaintiff "woke up more than once in the night groaning," because it was hearsay evidence. The weight of authority is in favor of admitting such testimony. Matteson v. Railroad Co., 35 N. Y. 487; Perkin v. Railroad Co., 44 N. H. 223; Houston, etc., v. Shafer, 6 Am. & Eng. R. R. Cases 421; Railroad Co. v. Newell, 104 Ind. 264; Yeatman v. Hart, 6 Humph. (Tenn.) 374; Eckles v. Bates, 26 Ala. 655; Kent v. Lincoln, 32 Vt. 592; State v. Gedicke, 43 N. J. Law 86; Note to 28 Am. & Eng. R. R. Cases 563. The duty of inspection applies to foreign cars as well as to those owned by the railroad company, and the use of such cars with defective coupling apparatus is negligence. Sherman & Redfield on Negligence, § 196; Gottlieb v. Railroad Co., 100 N. Y. 462; O'Neil v. Railroad Co., 9 Fed. Rep. 337; Fay v. Railroad Co., 11 Am. & Eng. R. R. Cases 193; Goodrich v. Railroad Co., 41 Id 259; Bomar v. Railroad Co., 88 So. Rep. 478; Railroad Co. v. Barber, 44 Am. & Eng. R. R. Cases 523. Plaintiff was only bound to

·raise by his proof a reasonable presumption of negligence. If the facts proved made it probable that the defendant neglected its duty, it is for the jury to decide. Greenleaf v. Railroad Co., 29 Iowa 14-46; Benzing v. Stenway, 101 N. Y. 553; Morton v. Railroad Co., 46 N. W. Rep. 111.

The opinion of the court was delivered by

CORLISS, C. J.    The circumstances under which plaintiff was injured we think warranted the jury in finding that the defendant's negligence was one of the proximate causes of the damage which the plaintiff suffered. He was an employe of the defendant, acting as switchman. The first important fact in the history of the accident was the stepping of the plaintiff upon the foot-board of a switch engine to ride down upon it to a flat-car standing upon a curved switch, for the purpose of aiding in coupling the engine to the car in order to transfer it to another track. The car did not belong to defendant, but was owned by the Union Tank Line Company. This fact is of no moment, however, as the defendant was bound to inspect this foreign car the same as one of its own cars. Goodrich v. Railroad Co., 116 N. Y. 398, 41 Am. & Eng. R. R. Cases, 259, 22 N. E. Rep. 397; Gottlieb v. Railroad Co., 100 N. Y. 462, 24 Am. & Eng. R. R. Cases 421, 3 N. E. Rep. 344; Railroad Co. v. Kernan, 78 Tex. 294, 14 S. W. Rep. 668; Bomar v. Railroad Co., 42 La. Ann. 983, 8 S. Rep. 478; Fay v. Railroad Co., 30 Minn. 231, 11 Am. & Eng. R. R. Cases 193, 15 N. W. Rep. 241; O'Neil v. Railroad Co., 9 Fed. Rep. 337; Railroad Co. v. Barber, 44 Kan. 612, 44 Am. & Eng. R. R. Cases 523; Gutridge v. Railroad Co., 94 Mo. 468, 7 S. W. Rep. 476. It was defendant's duty to make this inspection before incorporating the car into one of its trains. More than sufficient time had elapsed since receiving the car to enable it to perform this duty, as the accident occurred in Jamestown, in this state, a considerable distance beyond the point where the car must have first come into its possession. It had been long enough in its custody to be carried to its destination and unloaded, as it was standing empty upon the switch at the time plaintiff was injured. There is no proof that the car was ever inspected. The defect was of such a nature

that the exercise of reasonable care in making an inspection must have disclosed the defect. Therefore, whether the car was or was not inspected, there was sufficient to justify a verdict that the defendant had been careless in the discharge of its duty to use reasonable care to furnish its employes with safe appliances of every kind, and keep them in safe condition. Railroad Co. v. Herbert, 3 Dak, 38, 8 Am. & Eng. R. R. Cases 85, 116 U. S. 642, 24 Am. & Eng. R. R. Cases 407, 6 Sup. Ct. Rep. 590. This is one of the master's duties, and the servant upon whom the master devolves its performance represents the master in that respect, and is not in the discharge thereof a fellow servant of the employe injured. Railroad Co. v. Herbert, 116 U. S. 642, 6 Sup. Ct. Rep. 590; Railroad Co. v. Kernan, 78 Tex. 294, 14 S. W. Rep. 668; Fay v. Railroad Co., 39 Minn. 231, 11 Am. & Eng. R. R. Cases 193, 15 N. W. Rep. 241; Condon v. Railroad Co., 78 Mo. 567; Bushby v. Railroad Co., 107 N. Y. 374, 14 N. E. Rep. 407; Ell v. Railroad Co., 1 N. D. 336, 48 N. W. Rep. 222. When plaintiff stepped upon the foot-board of the engine it appears to have been a short distance from the car, and was backing down towards it slowly. Plaintiff stood upon that portion of the foot-board which was on the short side of the curve of the switch. On the other side, standing also on the foot-board, was the foreman of the switching crew. He guided the link into the opening, while plaintiff reached over to the flat-car to pick up a pin lying there, for the purpose of using this pin to complete the coupling. While in this position he was squeezed between the locomotive and the car, and injured, because, as the evidence demonstrated, there was too little space between them, owing to the undue shortness of the draw-bars both of the car and of the engine. He rests his right to indemnity upon this conduct of defendant in permitting a car with so short a draw-bar to be placed upon its track for use, and in augmenting the danger by bringing it into connection with an engine whose draw-bar was likewise, as appears from some of the evidence, much shorter than the draw-bars in ordinary use. Each of these draw-bars was, according to some of the evidence, so much shorter than those in common use that we are inclined to the view that the jury were justified in holding

the defendant negligent on this account. Nor can it be said that the risk attending the use of such short draw-bars—particularly their use in connection with each other—was one of the ordinary risks of the employment, in the usual sense of that phrase. The evidence discloses that they were so short that when their ends came together there was only about 10 inches between the end of the car and of the locomotive, whereas the usual space, according to the evidence, is from about 24 to 30 inches. To so diminish this usual standing room that an employe is almost sure to be caught when in the discharge of his duty between a heavy standing car and an engine whose momentum, because of its weight, is tremendous, however slow its speed, would seem to be some evidence of negligence. If the space is too narrow for the body, serious injury is almost inevitable in case the servant is caught. There is respectable authority for the proposition that these facts warrant a finding of negligence. Railroad Co., v. Fredericks, 71 Ill. 294; Greenleaf v. Railroad Co., 29 Iowa, 14; Belair v. Railroad Co., 43 Iowa, 662; Crutchfield v. Railroad Co., 78 N. C. 300; Railroad Co. v. Callbreath, 66 Tex. 526, 1 S. W. Rep. 622.

Assuming that the jury were justified in finding the defendant guilty of negligence, it remains to be considered whether the plaintiff was not guilty of contributory negligence as a matter of law. The question arises not under ordinary circumstances. The defendant appears expressly to have imposed upon plaintiff duties in addition to those which the law would imply from an ordinary contract of employment of a switchman. At the time the plaintiff entered into the service of the defendant, the latter presented to plaintiff for signature certain regulations, and plaintiff, in answer to the question printed thereon, "Have you read and do you understand the following extract from the book of rules of the Northern Pacific Railroad Company?" replied in his own handwriting: "I have read and understand them." So far as they are here material, these rules are as follows: "Great care must be exercised by all persons when coupling cars. Inasmuch as the coupling apparatus of cars and engines cannot be uniform in style, size or strength, and is liable to be broken, and as from various causes it is dan-

gerous to expose between the same the hands, arms or persons of those engaged in coupling, all employes are enjoined before coupling cars or engines to examine so as to know the kind and condition of the draw heads, draw-bars, links and coupling apparatus, and are prohibited from placing in the train any car with a defective coupling until they have first reported its defective condition to the yardmaster or conductor. Sufficient time is allowed, and may be taken by employes, in all cases to make the examination required." Our first concern is to ascertain the true scope of this regulation. It will hardly be claimed that it was the purpose of defendant to impose upon the plaintiff all the duties of a car inspecter, so far as the proper discharge of such duties were essential to the protection of the plaintiff. Such an interpretation would in effect exempt the defendant from liability for its own negligence, however gross. The same facts which would convict the defendant of carelessness would, under such a view of the rule, likewise convict the plaintiff of contributory negligence in every instance. The employer would thus save itself from liability, although negligent in the discharge of the duties of a master. It is an elementary rule of construction that the courts shrink from so interpreting the language employed by a common carrier as to exempt it from the consequences of its own negligence. No such interpretation will be adopted, unless by the use of the word "negligence," or by other explicit language, the court is driven to such view. Then the provision so exempting from negligence is often struck down as opposed to public policy. (Whether the doctrine relates to an employe as well as to the public it is not necessary to decide.) It would be unreasonable to give the rule this construction. It would not be practicable for one employed in coupling cars to devote the same amount of time to and exercise the same degree of care in the inspection of the apparatus employed in the coupling of cars, and of such parts of the car as are immediately connected therewith, as a car inspector must. To exempt the company from liability, something more than a short examination must be made by the car inspector. There may be obscure defects which the exercise of due care renders it imperative he should discover, and for

his failure to discover and remedy which the company would be responsible; and yet for the master to insist that a trainman or a switchman should be held to the obligation of making such an investigation as would result in their disclosure would seriously cripple the power of the company to handle and ship the freight intrusted to it. It would be an unreasonable and impracticable requirement that all the dangers to an employe which a proper car inspection should bring to light should be discovered every time two cars are coupled together, or one car is coupled to a locomotive. It would be exacting of the trainman or the switchman more onerous duties than those imposed upon the expert car inspector. The company would require the less expert servant to discover at his peril a defect which the more expert employe had failed to detect. With less skill in such matters, and less time to investigate, it would be a gross wrong to allow the master to dictate to his servant the condition that he would have no redress for the injury occasioned by the master's carelessness because he, the servant, had not complied with a regulation which it would be impossible for him to observe. But it is within the domain of possibility for the employe to obey this rule, when reasonably construed. There are defects which will appear when extra care is used. We think the reasonable construction of this rule is that more than ordinary care must be exercised by the employe; that he may not rely implicitly upon the uniform discharge by the master, through his servants, of the duty of using ordinary care in furnishing proper and safe appliances and machinery, and in keeping them in repair, and that he must in some measure be on his guard against injury from the occasional negligence of those who are charged with the performance of the master's duties to his employes. No matter what degree of care is exercised in the selection of the servants by whom these master's duties are to be discharged, negligence will sometimes characterize their conduct. Said the court in Smith v. Potter, 46 Mich. 258, 9 N. W. Rep. 273: "When a brakeman handles any car, he knows that there is at least a possibility that he may be injured unless he examines it carefully. It may not always be legal negligence in him to rely with some assurance on the accuracy of the

persons who should have examined it before it comes to him. But he is bound to know that omissions of such care are possible, and are dangerous if they occur. And he is also bound to know, as all men know, that it is impossible for employes to completely guard against it." It would be contrary to sound policy to suffer the master to exonerate himself from liability in all cases, even by agreement with the servant. But there are defects resulting from the careless performance of the master's duties, so patent that it is very reasonable for the master to charge an employe with the duty of discovering such defects at his peril. Even in the absence of any regulation, the servant is often held accountable for his failure to guard against such defects. In this case the regulation but augmented this obligation. It called the servant's attention to the fact that the very difficulty which occasioned the injury sometimes existed. It notified him that the coupling aparatus of cars and engines were not uniform in size; this embraces differences in length. It apprised him of the danger of the work; enjoined upon him the duty of examining so as to know the kind and condition of the draw-heads, draw-bars, links, and coupling aparatus; prohibited him from placing in the train any car with a defective coupling; and, that the rule might be faithfully obeyed by the servant, it explicitly granted to him ample time to observe its behests. The language is unmistakable: "Sufficient time is allowed, and may be taken by employes in all cases, to make the examination required." It was insisted at the bar of this court that this rule was not ordained in good faith; that it was never expected that an employe would observe it; and that any servant who took sufficient time to follow and obey its requrements must inevitably look for discharge. On what principle this court is asked to attribute a Machiavellian policy to the defendant, we are at a loss to determine; and, should we find that only grasping self-interest, without one touch of humanity, was the motive for this rule, still we must adjudge that its grant of sufficient time to make the examination enjoined was written in good faith, when the rule receives, as we believe it was the purpose of the defendant that it should receive, a reasonable construction. In the light of such an interpretation of it, it is

obvious that the use of this time by the servant will not seriously discommode the master or delay the shipment of its freight. And, on the other hand, the master has a deep interest in the safety of the servant; for, no matter how perfect the former's defense to a claim for damage, the making of that de-- fense is always attended with expense. Unadulterated selfish- ness would prompt the adoption of a regulation, the observance of which would save such expense, while not materially reduc- ing the servant's efficiency or affecting the volume of work he can perform. It is without force to assert that the master would discharge an employe who would take the necessary time to make the required examination. Should he discharge the servant before his term of employment had expired, for no other reason, the law would give the servant redress; and, if no time of employment is prescribed, it is the master's legal right, as it is the legal right of the employe, to terminate the relation at any time, without any excuse at all, or for any reason, however un- justifiable in ethics. We would not, however, be understood as asserting that the master could insist upon a rule when the master's conduct in the discharge of its employes, or in any other manner, indicated a purpose not to accord to the latter the necessary time without which the master's command to the exercise of a higher degree of care could not be obeyed. Its actions must not belie its words. This record discloses no such condition of affairs. Neither the plaintiff nor any other em- ploye of the defendant has been discharged, or threatened with discharge, because he sought in good faith to comply with this regulation, and took the necessary time for that purpose. Nor are we confronted with the difficult question as to the rights of the plaintiff, had some one in superior authority commanded a disregard of the rule; neither was the press of business such that a full observance of its behests was not practicable. There was no exigency. The plaintiff, with the defects in full view— one immediately beneath his gaze, and one before his eyes only a short distance away—moved slowly toward his fate, oblivious of danger, because, as is conceded, he took no precautions to discover an open peril. He seeks to excuse his omission to examine the length of the draw-bar by his statement, upon

which the verdict of the jury has set the seal of truth, that he was engaged in looking for a pin with which to make the coupling. The pin could have been found as well after he had observed the defendant's rule, that he must examine to ascertain whether there was any danger from the size of the draw-bars of the engine and of the car. The same argument would exonerate him from blame had the coupling apparatus and the dead-woods been entirely wanting. He testified that he knew every road had different cars, with different length draw-heads; that prior to the accident he did not notice the length of the draw-heads of the car and of the engine; that, if he had known of the undue shortness of these draw-heads, he could have escaped injury, as there was plenty of time for him to have stepped down and out from the end of the foot-board upon the ground, so as to clear himself from the flat-car before he was hurt; and that he knew that, if two cars met upon a curve, the distance between them would be shorter on the inside than on the outside of the curve. It is clear that plaintiff made no effort to obey the rule requiring him to make an examination of the coupling apparatus. He does not pretend to have obeyed it. He disavows any such obedience. That an observance of its requests, giving it a reasonable interpretation, would have saved him from injury, cannot admit of doubt. The defects were patent; the difference between the combined lengths of these draw-bars and the combined lengths of those in ordinary use was 14 to 20 inches. The ratio was about 10 to 30. One was directly beneath his gaze; the other was almost directly before his eyes. There was time for inspection while the engine was moving slowly backwards. Further time might have been taken, if necessary, under the rule. To fail to discover, under these circumstances, that these draw-bars were only about one-third the usual length, must be negligence, particularly in view of the express warning contained in the rule, the injunction to examine so as to know the kind and condition of the coupling apparatus, and the granting of sufficient time for that purpose. When warned of the danger generally, and afforded time to pause and examine whether it existed in the particular case, the

servant may not, with thoughtless imprudence, rush headlong upon peril at the expense of his master.

Said the court in Karrer v. Railroad Co., 76 Mich. 400, 43 N. W. Rep. 370, after quoting a regulation of the defendant very similar to the one in the case at bar: "It was plaintiff's duty to examine into the coupling arrangements of both cars before he attempted to couple them, and as they were only a rod apart at most before he started the train back, and as he says the defect was visible at once to any one looking, one or two seconds would have furnished all the time needed to satisfy himself had he been acting under any one else's orders; but, as he had personal direction of the engineer's movements and could move when he pleased, the case, as he presents it, was an aggravated one of the grossest carelessness, for which he, and no one else, was responsible." Said the court in Darracutts v. Railroad Co., 83 Va. 288, 2 S. E. Rep. 511, 514: "At all events the evidence shows that the dangerous condition of the coupling was obvious, and that the plaintiff, in violation of the rules of the company, voluntarily put himself in a position of danger, in consequence of which he was injured. Under these circumstances, in the eye of the law, he was the author of his own misfortune; that is to say his negligence, or, what is the same thing, his failure to use reasonable care and caution, was the proximate cause of the injury complained of. The action is not therefore maintainable." In Railroad Co. v. Smithson, 45 Mich. 212, 7 N. W. Rep. 791, there was no rule giving warning, enjoining examination and according sufficient time for that purpose; and yet it was held fatal to recovery that the plaintiff, a brakeman, had failed to notice that there were double dead-woods on the cars he was coupling, instead of a single dead-wood on each, it being contended that it was negligence for the defendant to receive and transport cars equipped with double dead-woods. Said Judge COOLEY: "If, therefore, a switchman were to declare that he had attempted to couple the double dead-woods without noticing how they differed from the cars of defendant, the conclusion would be inevitable that he had gone heedlessly in the performance of a duty requiring great care, and that he had not allowed his eyes to inform him what was before him. * * * The

best notice is that which a man must of necessity see, and which cannot confuse or mislead him. He needs no printed placard to announce a precipice when he stands before it." In a similar case, Hathaway v. Railroad Co., 51 Mich. 253, 16 N. W. Rep. 634, the court said: "In this case the danger consisted in the brakeman being caught between the two dead-woods as they came together. The dead-woods were in plain sight. They were really the most prominent objects on the end of the cars. The plaintiff had a full opportunity of examining the one by which he stood some moments before the cars came together. It's size, shape, and the location of the draw-bar were before him. He had only to look at it to be informed of any peril surrounding it. The moving car, at a distance of 20 feet, with its dead-wood and draw-bar in plain view, slowly approached the one where the plaintiff was standing. It does not appear that there was any hurry about the business. How could the plaintiff have been better warned? Certainly he knew the car was coming, and could see the dead-woods and draw-bar thereon as well as if he had made the coupling a thousand times before. He could not fail to see it, if he looked at all." See, also, Kelley v. Railroad Co., 21 Am. & Eng. R. R. Cases 633; Railroad Co. v. Black, 88 Ill. 112; Brewer v. Railroad Co., 56 Mich. 620, 23 N. W. Rep. 440; Railroad Co. v. Rice, 51 Ark. 467, 11 S. W. Rep. 699. In several of the cases referred to, the master had not, as in the case at bar, imposed upon the servant the duty of extra care, nor had he expressly granted to him sufficient time to enable him to examine the coupling apparatus before making the coupling. It must further be remembered that plaintiff was on the short side of the switch. He testified that he knew the distance would be shorter on the inside than on the outside of the curve. But he seems to have paid no attention to this obvious law. Being upon the shorter side, it was all the more important for him to ascertain whether there would be sufficient room between the car and the engine for him to stand with safety on the foot-board in making the coupling. It does not seem to be strenuously insisted that a charge of negligence can be predicated upon the curve of the switch. There is no evidence of the degree of the

curve, and there is eminent authority for the proposition that, unless the curve is abnormally sharp, the courts will not regard it as evidence of carelessness. Tuttle v. Railroad Co., 122 U. S. 189, 7 Sup. Ct. Rep. 1166. The language of the court in this case, both on this point and the further point of contributory negligence, because the injured servant stood upon the inside of the curve in making the coupling, is very applicable here: "The perils in the present case arising from the sharpness of the curve were seen and known. They were not like the defects of unsafe machinery which the employer has neglected to repair, and which his employes have reason to suppose is in proper working condition. Everything was open and visible, and the deceased had only to use his senses and his faculties to avoid the dangers to which he was exposed. One of these dangers was that of the draw-bars passing each other when the cars were brought together. It was his duty to look out for this, and avoid it. The danger existed only on the inside of the curve, and this must have been known to him." On the question whether it was negligent to build a switch and with so sharp a curve, the court observed: "We have carefully read the evidence presented by the bill of exceptions, and, although it appears that the curve was a very sharp one at the place where the accident happened, yet we do not think that public policy requires the courts to lay down any rule of law to restrict a railroad company as to the curves it shall use at its freight depots and yards, where the safety of passengers and the public is not involved, much less that it should be left to the varying opinion of juries to determine such an engineering question." It is true that in the Tuttle case there was no one standing on the foot board on the outside of the curve, as in the case at bar; but, if the brakeman was bound in the Tuttle case to know that it was dangerous to stand on the inside when there was no one on the outside, surely the plaintiff in this case was bound to know that his position was one of danger, although there was some one standing on the outside. The fact that another stood in one of the places of safety did not render the place occupied by plaintiff any less dangerous or obscure his sense of that danger. The other place of safety was outside of the space

between the car and the engine, on the ground. Perhaps he might not have found room with the foreman on the outside of the curve on the foot-board, but he might have gone ahead, and set the pin, and, if the jar of the collision had not been sufficient to cause the pin to fall down into its place, then he could have inserted it in the aperture with his hands without the slightest danger, or, at least, he then would have plainly seen the danger of going between the engine and the car on the short side of the curve, and could have completed the coupling on the long side. The plaintiff has sustained severe, and perhaps permanent, injuries. His case appeals to our sympathy, and he may be a not unworthy object of charity, but justice will not seize his master's property to compensate him for the consequences of his own imprudence. There seems to be marked unanimity on the point that, where disobedience to or disregard of a reasonable rule or regulation of the master contributes to the injury, there can be no recovery. Sloan v. Railroad Co., 86 Ga. 15, 12 S. E. Rep. 179; Cahill v. Hilton, 106 N. Y. 512, 13 N. E. Rep. 339; Karrer v. Railroad Co., 76 Mich. 400, 43 N. W. Rep. 370; Railroad Co. v. Wallace, (76 Tex., 636 Sup. Ct.), 13 S. W. Rep. 565; Railroad Co. v. Thomas, 51 Miss. 640; Deeds v. Railroad Co., 74 Iowa 154, 37 N. W. Rep. 124; Railroad Co. v. Rice, 51 Ark. 467, 11 S. W. Rep. 699; Sedgwick v. Railroad Co., 76 Iowa 340, 41 N. W. Rep. 35; Wolsey v. Railroad Co., 33 Ohio St. 227; Railroad Co. v. Whitcomb, 111 Ind. 212, 31 Am. & Eng. R. R. Cases 149.

Plaintiff may not ask us to speculate whether, by the exercise of due care, he would have discovered the peril, and avoided the danger, had he made the examination which the rules of the company required. We think an observance of this reasonable rule would have saved him from injury. If he had stopped and looked, and then failed to discover the peril that menaced him, possibly a different case might have been presented. But this is doubtful. The exercise of proper care must have revealed the danger. We hold that this record discloses the fact that plaintiff's own negligence contributed to his injury, and the judgment and order denying the motion for a new trial must therefore be reversed, and a new trial granted.

A single question as to the admissibility of certain evidence remains to be considered. The wife of plaintiff was allowed, against the defendant's objection, to testify to exclamations of pain made by the plaintiff on waking up during the night. She said: " Well, he has more than once woke up—more than once in the night—groaning; and I asked him what was the matter." The record discloses nothing further on this point. It does not appear that she testified touching his answer to her inquiry as to what was the matter with him. We are very clearly of the opinion that this evidence was admissible, both on principle and under the great weight of the adjudications. There was no attempt to prove a narration by him of a past transaction. He was not stating that the night before he had suffered pain. He was making no communication whatever to her. It was only the involuntary expression of suffering. True, it might have been simulated, but that was a question for the jury. The evidence of the physician relating to the extent of his injuries must have rested in some degree upon statements of the plaintiff to him, and therefore what is more truly hearsay than exclamations of pain. The testimony of the medical expert may often be founded mainly upon such interested declarations of the patient, and yet its competency cannot be seriously questioned. On the other hand, the rule allowing the proof of the expression of present pain will rarely result in imposition upon juries or other triers of questions of fact. Other facts in the case will generally aid them in determining how much of real and how much of fictitious pain the expression of suffering shadows forth. We think the true rule is stated in Railroad Co. v. Newell, 104 Ind. 264-269, 3 N. E. Rep. 836: "Where, however, it becomes important to illustrate the physical or mental condition of an individual, either at the time an injury is received, or from thence to the time of an inquiry as to its severity, effect and nature, we think expressions or declarations of present existing pain or malady, whether made at the time the injury is received or subsequently to it, are admissible in evidence; [citing many authorities.] Expressions of pres-

ent existing pain, and of its locality, are exceptions to the general rule which excludes hearsay evidence. They are admitted upon the ground of necessity, as being the only means of determining whether pain or suffering is endured by another. Whether feigned or not, is a question for the jury. Such declarations and expressions are competent, regardless of the person to whom they are made." See, also, cases cited in opinion, and State v. Gedicke, 43 N. J. Law, 86; Eckles v. Bates, 26 Ala. 655; Yeatman v. Hart, 6 Humph. 374; Hangenlocher v. Railroad Co., 99 N. Y. 136, 1 N. E. Rep. 536. Reversed and new trial ordered. All concur.